Mary KARPOVICH

v.

David MATHEWS, Secretary of Health, Education and Welfare.

Civ. A. No. 76–1188.

United States District Court, E. D. Pennsylvania.

Jan. 13, 1977.

the dependents of miners who died due to pneumoconiosis, or who were totally disabled due to pneumoconiosis at the time of their death.

Plaintiff's decedent, Joseph Karpovich, died on February 1, 1939, at 38 years of age, after working in the coal mines from about age 13, a period of approximately 25 years. *All* of the relevant evidence consists of the testimony of the plaintiff and her daughter, the latter being of little consequence except to the extent that it corroborates certain of the testimony of the plaintiff, a 76-year old widow who has not remarried since the death of her husband and has raised a family of 10 children.

The applicable law has been carefully stated in briefs submitted by both parties. We shall not repeat it. The only point of contention is whether Joseph Karpovich was totally disabled due to pneumoconiosis at the time of his death on February 1, 1939. Because of the long lapse of time and the intervening death of the two examining or treating physicians no medical records are available. Hence, the case turns almost exclusively on the plaintiff's testimony. This does not preclude the award of benefits and in similar cases benefits have, in fact, been awarded based primarily upon plaintiff's testimony. (See copies of opinions in *Sartori, Ruglas, Briel* and *Williams*) (R. 19–40).

Thus, we are concerned with the plaintiff's testimony, the review thereof by the Administrative Law Judge and his basis for the rejection thereof. The Administrative Law Judge (ALJ), in considering the evidence initially said as follows:

"It is recognized that where a miner died a number of years ago, it is frequently difficult to obtain definitive evidence as to work history, physical condition, or cause of death. In many cases, the only evidence of probative value available consists of nonmedical records, lay testimony, and affidavits. The conclusions to be reached are factual in nature, and absent other evidence, it cannot be disputed that

John A. Miernicki, Shenandoah, for plaintiff.

David W. Marston, U. S. Atty., Philadelphia, Pa., for defendant.

## MEMORANDUM

TROUTMAN, District Judge.

This case arises under Part B, Title IV of the Federal Coal Mine Health and Safety Act of 1969, as amended. 30 U.S.C. § 901 *et seq.* The act establishes a program for the payment of benefits to living miners who are totally disabled due to pneumoconiosis arising out of coal mine employment and to

such conclusions may be based solely upon the claimant's testimony. In many respects, this is such a case, and the testimony of the claimant must therefore be totally scrutinized."

(R. 8)

The ALJ thus recognized the importance of carefully reviewing and considering the plaintiff's testimony. He did so at length (R. 8, 9). He considered her testimony on direct examination "impressively vivid" (R. 9). However, on examination by the ALJ, he was less than impressed. He stated:

"Although direct testimony was impressive, as noted, on questioning by the administrative law judge, she did not know exactly where her husband was working at the time of death, who owned the mine, the size of the mine or what his job was. She knew nothing as to the number of employees. She did know that the three or four persons with whom he rode to work were also employed at that unknown place at that time. Certainly, there are instances in which employees after long and faithful service are given 'light work' by their employers in recognition of inability to continue normal labors. Likewise, fellow employees generally aid in the doing of hard tasks in the normal course of work, and the bonds of friendship are such that almost all work of one who is disabled may be done by fellow employees. However, Mr. Karpovich had worked at the mine for only 'a couple of months', and one so severely disabled would be most unlikely to be hired, particularly in a 'bootleg' operation, which typically is small and requires the fullest efforts of each employee."

(R. 9)

We have underscored those statements which apparently, in the opinion of the ALJ, discredited the plaintiff's testimony. It will be noted that the ALJ was understandably influenced by the fact that plaintiff "did not know exactly where her husband was working at the time of his death, who owned the mine, the size of the mine or what his job was". Thus, her lack of any

knowledge as to "where, who and what" understandably suggested that she was not telling the truth. Under most circumstances, we would agree.

However, the record shows that the decedent was employed and met his death in a "bootleg mine" (R. 83) where he had been employed only a few months after being laid off at "Packer Number Five", a legitimate anthracite mining operation owned by the Lehigh Valley Coal Company (R. 70). The ALJ, from Greensboro, North Carolina, could not possibly know the significance of the term "bootleg mine".

The history of the Anthracite region in the late Thirties and early Forties records that as the great depression brought the production of anthracite coal to a virtual halt, deep mines were closed and thousands of miners were thus unemployed, without the benefit of multiple government social programs such as exist today. As in this case, they sought to support large families. As here, they were uneducated, unqualified to perform other tasks or professions. No government training programs existed for retraining purposes. They knew how to mine coal and nothing else. To support themselves, they formed themselves into small groups of four and six men. They went upon coal land properties owned by large and legitimate coal companies and mined the "outcroppings"; i. e., the veins of coal located on or close to the surface. Necessary tools and equipment were sometimes picked up or stolen from said companies. They produced small quantities or tonnages of coal which in the night were removed and delivered to truckers who transported same to market—a market, consisting of customers in New York, Philadelphia and closer communities, which customers were themselves many times unemployed and thankful for the "cheap" fuel thus available to supply their hand-fired home heating furnaces.

In thus mining coal on coal company lands such miners, including plaintiff's decedent, were guilty of trespass, larceny and sometimes burglary. Thus, the location of

the "bootleg" mine or coal hole, and the individuals who worked there, was kept secret, sometimes even from their families. As time went on, the "bootleg" industry necessarily grew and was ultimately legitimatized by leasing arrangements with the land owner and the payment of at least a nominal royalty. They then became known as "independent" miners. In the meantime, however, repeated prosecutions of "bootleg" trespassers dictated the secrecy which explains the plaintiff's inability to explain *who* owned the mine, *where* it was located and *what* job duties were performed by the decedent. These men had no criminal intent, were not proud of what they were doing to sustain their families and understandably refused to share their "crime" with wives, children and neighbors. Even a whisper by a wife or child to a neighbor's wife or child might trigger the feared prosecution sought to be avoided.

Thus explained and so understood, the rejection of plaintiff's testimony was unwarranted although its rejection by the ALJ is not only understandable but to be expected. Records of such employment are, of course, non-existent as were accurate records of even legitimate employment during the period in question, a fact recognized by the ALJ (R. 9). We have thus gone beyond the record in the interest of justice. The purposes of the statute here being administered must not be aborted by a peculiar situation limited to a confined area, in this case, the Anthracite region.

Therefore, for the reasons stated, we do not believe the ALJ was justified in rejecting the plaintiff's testimony as to the decedent's "bootleg" employment (R. 9).

Finally, the ALJ assigned the following for the rejection of the plaintiff's testimony:

"A doubt which cannot be put aside, however, arises from the claimant's own testimony. She was specific in stating her youngest child was three years old at the time of death; that sexual relations had ceased because of the claimant's poor physical condition some three years prior

to his death. Yet, her application for benefits (Exhibit 2) discloses, 'We had nine children at home and I was pregnant with our thirteenth child at the time of his death' * * * *".

(R. 9)

The plaintiff testified:

"Q. And—and would you describe for me what your sexual life with your husband was like during the last two years of your—of his life?

A. Oh, about three years before that he didn't—couldn't.

Q. I didn't hear you.

A. I said about two—two and a half to three years I couldn't.

Q. You couldn't, or he couldn't?

A. He couldn't, yeah I mean.

Q. So you had no sex life—

A. No."

(R. 85, 86)

The plaintiff's testimony is sufficiently equivocal and sex a sufficiently evasive subject that, on this alone, her otherwise "impressively vivid" (R. 9) testimony should not be rejected. Absent the rejection of plaintiff's testimony and in the absence of any evidence to support a contrary result, the award of benefits is indicated and plaintiff's motion for summary judgment will be granted.

Because we have gone beyond the record in explaining the basis, in part, for our decision we shall grant the parties leave to seek a remand of the record should either or both so desire.