Joseph BIRMINGHAM

v.

The SECRETARY OF HEALTH,
EDUCATION AND WELFARE
OF the U. S.

Civ. A. No. 76–1636.

United States District Court,
E. D. Pennsylvania.

Jan. 13, 1977.

Ralph M. Bashore, Pottsville, Pa., for plaintiff.

David W. Marston, U.S. Atty., Philadelphia, Pa., for defendant.

MEMORANDUM AND ORDER

TROUTMAN, District Judge.

Before this Court are cross-motions for summary judgment filed by the plaintiff and the defendant respectively. Plaintiff instituted an action in this Court for benefits under the Federal Coal Mine Health and Safety Act, 30 U.S.C. § 921, *et seq.* after his claim was heard and denied by an Administrative Law Judge (ALJ) and by the Appeals Council of the Social Security Administration.

A crucial and threshold issue is the number of years during which the plaintiff was employed in the anthracite mines. The Administrative Law Judge (ALJ) has found that such employment existed for a period not exceeding five years (R. 20). The issue is crucial for several reasons, not the least of which is the effect the period of employment has upon the presumptions available to the plaintiff. As the ALJ said:

"* * * Since the claimant had less than 10 years of coal mine employment, he does not have the advantage of the presumption period." (R. 16)

The period of employment also affects the plaintiff's ability to meet the requirements as to "forced expiratory volume". The ALJ stated:

"The miner is shown to be 65 inches tall and under appropriate regulations (where the miner has less than 10 years of coal mine employment) it is required that he have a forced expiratory volume in one second ($FEV_1$) equal to or less than 1.6 liters and a maximum voluntary ventilation (MVV) equal to or less than 60 liters per minute."

(R. 17, 18)

The ALJ further stated:

"Even though there is some indication of a respiratory impairment, there is not sufficient evidence to establish that it was a direct result of his limited coal mine employment."

(R. 19)

Thus, the importance of the duration of coal mine employment becomes self-evident. It affects the medical issues, it affects the factfinder's evaluation of the evidence and may well determine the ultimate outcome of the case. It is important to both parties and of utmost importance to the plaintiff.

In reaching his conclusion that the plaintiff's employment in the mines did not exceed five years (see finding of fact # 3, R.

20) the ALJ stated that his finding was based on the "best evidence":

"* * * Based on the best evidence it is the opinion of the Administrative Law Judge that the claimant was employed as a coal miner for a period not exceeding five years."

(R. 16)

The "best evidence" relied upon by the ALJ was obviously the Social Security records alluded to in his prior discussion. (R. 15) This reliance and the result is both understandable and expected. The ALJ not being from the anthracite region and knowing nothing of its history could not possibly understand the plaintiff's contention of 18 years in the mines, only five of which are reflected on the Social Security records. Regrettably, he was given no opportunity to understand this possibility at the time of the hearing. Perhaps, he afforded himself no such opportunity. The ALJ himself conducted all the direct examination and he examined this rather dull and unresponsive plaintiff at length as to Social Security payments:

"Q. All right. Now was social security held out on you for, on each of these employers?

A. Ah, don't know what you mean, ah—

Q. Did they hold out social security, these men you worked for?

A. They paid social, in, some of them.

Q. Pardon?

A. Some of them paid social security in.

Q. Well, now you say some of them. Which ones didn't?

A. Well, there was only, let's see; the Herring Brothers paid in, and the Renninger's Coal Company.

Q. Now, you say Herring paid your social security?

A. Yeah.

Q. And who was the other one?

A. Renninger's Coal Company.

Q. Now they paid the social security?

A. Yeah.

Q. Now, what about the rest of them?

A. The rest was paid, just in cash.

Q. You were paid in cash by—

A. Yeah.

Q. —the rest of them, and they didn't pay social security on you?

A. No, not at that time, they didn't pay nothing.

Q. Well, you say 'at that time'. Now, social security went into effect in 1937, now.

A. Well, now, they didn't pay anything.

Q. And you was talking about, talking about working in a coal mine in '44.

A. Yes.

Q. So you really don't know whether they paid social security on you or not, do you?

A. Well, see, some of them are dead, I couldn't be able to find out.

Q. Sir?

A. Some of them are dead, and so I—

Q. Well, if, if they paid social security on you, it would appear in your social security records.

A. Yeah, it would. Yes, sir.

Q. So you really don't know whether they paid it or not, do you?

A. Right. No. No, I don't sir.

Q. Counselor, could you inform me when he employed you?"

(R. 61, 62, 63)

Regrettably, when the ALJ completed his examination of the plaintiff, the plaintiff's counsel did not seek to enlighten the ALJ as to the possible basis for plaintiff's present contention that only five of his eighteen years of employment in the mines were subject to Social Security deductions and payments. Rather, counsel's examination was limited to the following:

"Q. Mr. Birmingham, in all of your work, were you always an employee and a wage-earner?

A. Yes, sir.

Q. You were never an owner or a partner of any of the mines?

A. No, sir.

Q. That's all I have."

(R. 66)

Whether counsel assumed that the ALJ was familiar with the illegal origin of the so-called "independent" mining industry in the anthracite region and its non-compliance with Social Security and other legalities does not appear in this record. At the very least, the ALJ was entitled to *some* explanation as to the circumstances under which it is contended that multiple employers did not comply with the Social Security Act. In brief submitted to this Court, the plaintiff states:

"* * * Clearly it is apparent from the Administrative Law Judge's opinion that he has no knowledge of independent mining as it existed in Schuylkill and surrounding counties. The Administrative Law Judge's opinion concludes that the Plaintiff only worked five years and therefore was not entitled to benefits. We do not desire to repeat the Letter Brief, R–7, filed with the Appeals Council. We detail what independent mining is and was and we respectfully refer Your Honor to said statement and incorporate it herein by reference."

(See page 5 of plaintiff's brief.) Belatedly, the Appeals Council was given some explanation which we shall not here repeat (R. 7–10). Oddly, the Appeals Council showed no curiosity, apparently did not consider the wisdom of returning this record to the ALJ, but routinely disposed of the appeal without comment. The plaintiff deserves more. The peculiar origin and status of the "industry" in which he was allegedly employed for 18 years, which may account for the lack of Social Security records, is a matter to be considered in the final disposition of this case.

The unique status of the "bootleg" or "independent" mining industry has become an issue in other cases, but for different reasons. In the case of *Karpovich v. Mathews, Secretary of Health, Education and Welfare,* 426 F.Supp. 1316 (E.D.Pa.) (Social Security No. 200–44–4177) this Court stated:

"The history of the Anthracite region in the late Thirties and early Forties records that as the great depression brought the production of anthracite coal to a virtual halt, deep mines were closed and thousands of miners were thus unemployed, without the benefit of multiple government social programs such as exist today. As in this case, they sought to support large families. As here, they were uneducated, unqualified to perform other tasks or professions. No government training programs existed for retraining purposes. They knew how to mine coal and nothing else. To support themselves, they formed themselves into small groups of four and six men. They went upon coal land properties owned by large and legitimate coal companies and mined the 'outcroppings'; i. e., the veins of coal located on or close to the surface. Necessary tools and equipment were sometimes picked up or stolen from said companies. They produced small quantities or tonnages of coal which in the night were removed and delivered to truckers who transported same to market—a market consisting of customers in New York, Philadelphia and closer communities, which customers were themselves many times unemployed and thankful for the 'cheap' fuel thus available to supply their hand-fired home heating furnaces.

"In thus mining coal on coal company lands such miners, including plaintiff's decedent, were guilty of trespass, larceny and sometimes burglary. Thus, the location of the 'bootleg' mine or coal hole, and the individuals who worked there, was kept secret, sometimes even from their families. As time went on, the 'bootleg' industry necessarily grew and was ultimately legitimatized by leasing arrangements with the land owner and the payment of at least a nominal royalty. They then became known as 'independent' miners. In the meantime, however, repeated prosecutions of 'bootleg' trespassers dictated the secrecy which explains the plaintiff's inability to explain *who* owned the mine, *where* it was located and what job duties were performed by the decedent. These men had no criminal intent, were not proud of what they were doing

to sustain their families and understandably refused to share their 'crime' with wives, children and neighbors. Even a whisper by a wife or child to a neighbor's wife or child might trigger the feared prosecution sought to be avoided.

"Thus explained and so understood, the rejection of plaintiff's testimony was unwarranted although its rejection by the ALJ is not only understandable but to be expected. Records of such employment are, of course, non-existent as were accurate records of even legitimate employment during the period in question, a fact recognized by the ALJ. We have thus gone beyond the record in the interest of justice. The purposes of the statute here being administered must not be aborted by a peculiar situation limited to a confined area, in this case, the Anthracite region."

Given the truth of the plaintiff's allegations and the resultant effect upon applicable presumptions of law contained in the Act and the regulations, we have no choice but to remand the record for further consideration in accordance herewith.